FILED

2022 Mar-23  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **SAVANA L. BLACK,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-01726-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Savana Black has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. §§ 405(g) and 1383(c). The Commissioner denied Ms. Black's claim for a period of disability and disability insurance benefits, finding that Ms. Black was not under a disability from March 13, 2018 through February 18, 2020.  Ms. Black contends that, following her onset date, she suffered from diabetic symptoms that prevented her from maintaining full-time employment.  Ms. Black argues that the Administrative Law Judge's – the ALJ's –

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

analysis of her residual function capacity or RFC is flawed, and she contends that the ALJ erroneously determined that she can perform past relevant work. For the reasons that follow, the Court finds that substantial evidence supports the Commissioner's decision.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Black had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[2] A claimant must prove that she is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

_____

[2] "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same."

https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Sept. 29, 2021).

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or medically equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Ms. Black applied for a period of disability and disability insurance benefits and supplemental security income on October 25, 2018. (Doc. 9-6, p. 5). Ms. Black alleges that her disability began March 13, 2018. (Doc. 9-6, p. 5). The Commissioner initially denied Ms. Black's application on December 14, 2018. (Doc. 9-5, pp. 2-4). Ms. Black requested a hearing before an ALJ. (Doc. 9-5, p. 9). The ALJ determined that Ms. Black met the insured status requirements through March 30, 2022, (Doc. 9-3, p. 33), but the ALJ concluded that Ms. Black was not under a disability as defined in the Social Security Act from March 13, 2018 through

3

February 18, 2020, (Doc. 9-3, p. 39).  On March 24, 2020, Ms. Black filed with the Appeals Council exceptions to the ALJ's decision.  (Doc. 9-5, p. 66).  The Appeals Council denied Ms. Black's request for review (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Black's Medical Records*

Ms. Black has Type 1 diabetes.  (Doc. 9-10, p. 7).[3]  She was first diagnosed with the condition when she was eight years old.  (Doc. 9-10, p. 23).  According to Ms. Black's medical records, a normal glucose range is 70 mg/dL to 110 mg/dL. (Doc. 9-10, pp. 7, 25).  A glucose level above 350 mg/dL is critical.  (Doc. 9-10, pp. 7, 25).

On May 12, 2017, Ms. Black visited the emergency room.  Her glucose level was 445 mg/dL, and the lab results indicated that Ms. Black had uncontrolled diabetes.  (Doc. 9-10, pp. 23-27, 37- 42).   The attending physician discharged Ms. Black when she was stable.  (Doc. 9-10, pp. 25, 27).

On October 9, 2017, Ms. Black visited the emergency room again.  (Doc. 9-10, pp. 5-8.)  Her glucose level was 261 mg/dL.  (Doc. 9-10, p. 7).  The treating

---

[3] Some of Ms. Black's medical records bear the name Savana L. Hanson.

physician instructed Ms. Black to drink two liters of water a day and to check her blood sugar level four times a day.  (Doc. 9-10, p. 7).

Ms. Black visited the ER on October 16, 2017.  She complained of chest pain. (Doc. 9-10, pp. 9-13).  Ms. Black had a chest x-ray, and her blood was tested.  Her glucose level was 206 mg/dL.  (Doc. 9-10, pp. 29-31).

On January 14, 2018, Ms. Black sought treatment for "high ketones in urine" at Redmond Regional Medical Center in Rome Georgia. (Doc. 9-8, p. 137).  Ms. Black reported that she had nausea and vomiting for several days.  She was feeling weak, and her urine "smelled fruity and [was] spilling ketones."  (Doc. 9-8, p. 138). Ms. Black reported fatigue and weakness.  (Doc. 9-8, p. 138).  Ms. Black's glucose level was high at 243 mg/dL.  (Doc. 9-8, p. 142).  The ER physician diagnosed Ms. Black with hyperglycemia and high blood pressure.  (Doc. 9-8, p. 144).

At the request of Disability Determination Services, Ms. Black had an appointment with Cherokee Eye Clinic on June 7, 2018.  Ms. Black reported migraine headaches, blurred vision, and light sensitivity.  (Doc. 9-8, p. 12).  Ms. Black's vision was 20/400 in both eyes without glasses and 20/20 in her right eye and 20/25 in her left eye with best correction.  (Doc. 9-8, p. 2).  Ms. Black was diagnosed with non-proliferative diabetic retinopathy.  (Doc.  9-8, p. 3).  The optometrist who examined Ms. Black indicated that her retinopathy "should improve [with] good [blood sugar] control."  (Doc. 9-8, p. 3).  The optometrist recommended

that Ms. Black closely monitor her blood sugar to treat her condition.  (Doc. 9-8, p. 3).  Ms. Black got contact lenses a few weeks later.  (Doc. 9-8, p. 4).

On June 19, 2018, Ms. Black visited the ER.  (Doc 9-10, p. 57).  Her chief complaints were high blood sugar and hip pain.  Ms. Black reported that she had run out of insulin several days before, and she had fallen and "had some paresthesia[] in the left leg."  (Doc 9-10, p. 57).  Ms. Black's blood sugar was 311 mg/dl.  (Doc 9-10, p. 57).  She was given insulin to correct her blood sugar level.  (Doc. 9-10, p. 60).  The treating physician noted that he planned to x-ray Ms. Black's pelvis, treat her pain, and renew her insulin, but he needed to administer a pregnancy test before the x-ray.  Before he could order the x-ray, Ms. Black "suddenly got up an eloped from the emergency room without saying anything."  (Doc. 9-10, pp. 60-61).

Ms. Black had her first appointment at Healthy Life Center on July 24, 2018. Ms. Black saw a nurse to have labs drawn for a comprehensive metabolic panel, total cholesterol, HDL, and triglycerides, and to determine her A1c.  (Doc. 9-8, p. 44). Ms. Black reported no problems and no medications.  (Doc. 9-8, p. 44).

Ms. Black returned to Healthy Life Center on July 30, 2018, to review the lab results from her previous visit.  Her glucose level was 343 mg/dl, and her A1c was 10.9%.  (Doc. 9-8, p. 40).  Ms. Black reported that she had been out of insulin, but she was not able to see a medical provider.  (Doc. 9-8, p. 40).  Ms. Black reported that her A1c "[had] improved as it was as high as 16 recently."  (Doc. 9-8, p. 40).

6

Ms. Black received prescriptions for an insulin pen, blood sugar testing strips, and lancets to check her blood sugar four times a day as needed. (Doc. 9-8, p. 42). Ms. Black scheduled a two-week follow-up appointment. (Doc. 9-8, p. 42).

On August 13, 2018, at her follow up visit, Ms. Black reported that she was taking her medication as directed and that she had an average diet of 2000-2500 calories per day. She reported that her home glucose readings had been in the 180-200 mg/dL range while fasting, but overall, her glucose levels were higher in the mornings and lower in the evenings. (Doc. 9-8, pp. 36-38.). The nurse practitioner referred Ms. Black to an endocrinologist and prescribed Humalog and gave her samples of Naproxen for lower back pain. She scheduled Ms. Black to return in two weeks to check her progress. (Doc. 9-8, pp. 36-39).

On September 1, 2018, Ms. Black went to the ER. Her chief complaints were hyperglycemia and a runny nose. (Doc. 9-8, p. 127). Ms. Black's glucose level was 341 mg/dl, and her urine analysis was positive for protein, blood, and glucose. (Doc. 9-8, pp. 127- 29, 132). A CT scan was negative for pancreatitis. (Doc. 9-8, p. 127). The treating physician gave Ms. Black a fluid bolus and started her on an insulin drip before admitting her for treatment. (Doc. 9-8, pp. 127-29). Ms. Black was discharged the next day with instructions to continue taking Lispro (insulin) and to start taking Levemir (insulin), Claritin, Guaifenesin, Flonase, and sodium chloride

nasal spray. (Doc. 9-8, pp. 123-24). At discharge, Ms. Black's glucose was 179 mg/dl. (Doc. 9-8, p. 126).

On September 27, 2018, Ms. Black visited Healthy Life Center to have labs drawn. (Doc. 9-8, p. 23). Ms. Black returned to Healthy Life Center on October 2, 2018, to review the results of her labs. Ms. Black's glucose was 160 mg/dL and her A1c was 8.3%. Ms. Black reported fatigue and low back pain. (Doc. 9-8, pp. 19-20). Ms. Black also complained of finger pain in her right hand. She reported discomfort on the palm side of her hand that was constant and felt like pins, needles, and stabbing. (Doc. 9-8, p. 19). She stated that the pain had begun two weeks earlier with numbness in her middle finger. The physician referred Ms. Black to an orthopedist. (Doc. 9-8, p. 22). Ms. Black's record reflects that she was smoking one pack of cigarettes per day, and she had been a smoker for 14 years. (Doc. 9-8, p. 20).

On October 22, 2018, Ms. Black sought treatment for hyperglycemia at Redmond Regional Medical Center. (Doc. 9-8, pp. 112, 138-46). Ms. Black reported that the previous night her blood glucose level "was elevated in the 450s." (Doc. 9-10, p. 112). Ms. Black also reported that she was experiencing blurred vision and left side paresthesia of her face and arm. (Doc. 9-8, p. 112). Ms. Black's neurologic exam indicated that she had numbness, tingling, and vision change.

(Doc. 9-8, p.  113).  Ms. Black's glucose level was "high" at 155 mg/dL.  (Doc. 9-8, pp. 116, 118).

On October 25, 2018, Ms. Black visited an orthopedist at Harbin Clinic.  (Doc. 9-8, p. 83).  Ms. Black reported that her "right long finger" had been painful for a year.  She explained that her finger was catching and locking and was becoming stiff.  (Doc. 9-8, p. 83).  Dr. Klasson indicated that Ms. Black was in the process of getting an insulin pump. (Doc. 9-8, p. 83).  Dr. Klasson spoke with Ms. Black about the condition trigger digit and recommended surgery to correct it.  (Doc. 9-8, pp. 83-84).

Ms. Black visited an endocrinologist at Harbin Clinic on November 12, 2018. (Doc. 9-8, p. 11).  Dr. Mansoura noted that Ms. Black was a Type 1 diabetic with retinopathy.  (Doc. 9-8, p. 153).  He recommended that Ms. Black walk 30 minutes a day, use glucose tablets for hypoglycemia, and have yearly eye exams.  (Doc. 9-8, p. 153).  Dr. Mansoura also noted that Ms. Black would begin to use an insulin pump in two weeks if her insurance approved it.  (Doc. 9-8, p. 153).  Ms. Black scheduled an appointment to follow up with Dr. Mansoura in two months. (Doc. 9-8, p. 154).

Ms. Black had an appointment at Healthy Life Center on November 27, 2018. (Doc. 9-8, p. 159).  Ms. Black reported that her home glucose levels had been "fairly good, with average fasting glucose running the 120-150 mg/dL range. . . . and recently [in the] 180s-200s mg/dL."  Ms. Black also reported that Dr. Mansoura was

planning to put her on an insulin pump. (Doc. 9-8, p. 159). Ms. Black received prescriptions to refill test strips and Levemir. (Doc. 9-8, p. 161).

On January 17, 2019, Ms. Black visited Harbin Clinic for a follow-up appointment with Dr. Mansoura. (Doc. 9-11, pp. 32, 34). Ms. Black reported that she continued to check her blood sugar four times per day. She stated that she could not tolerate Metformin. (Doc. 9-11, p. 34). In her left foot, Ms. Black's ankle reflex was absent or diminished. (Doc. 9-11, p. 34). Dr. Mansoura noted that Ms. Black would begin using an insulin pump soon. (Doc. 9-11, p. 34).

On January 24, 2019, Ms. Black visited Harbin Clinic to receive her insulin pump. (Doc. 9-11, pp. 29-30). Ms. Black received insulin pump training, and she was able to demonstrate her ability to use the insulin pump correctly. Ms. Black scheduled a three-month follow-up appointment. (Doc. 9-11, p. 31).

Ms. Black had an appointment at Harbin Clinic to review labs on March 19, 2019. (Doc. 9-9, p. 161). Ms. Black complained of peripheral neuropathy with tingling and numbness and a rash on her leg. She reported that her home glucose readings were good, averaging less than 120 mg/dL. (Doc. 9-9, p. 161). The doctor noted that Ms. Black had seen an endocrinologist, and she was doing well on an insulin pump. Her glucose was 150 mg/dL and her A1c was 10.9%. (Doc. 9-9, p. 161).

Ms. Black had an appointment at Harbin Clinic on April 22, 2019.  (Doc. 9-11, p. 25).  Ms. Black was doing well with an insulin pump.  (Doc. 9-11, p. 28).  Dr. Mansoura instructed Ms. Black to continue the American Association of Diabetes diet, to walk 30 minutes a day, and to use glucose tabs for hypoglycemia and sliding scale for hyperglycemia. (Doc. 9-11, p. 28).

Ms. Black visited Cherokee Medical Center on June 17, 2019.  (Doc. 9-10, p. 73).  She reported that she was 11 weeks pregnant and that she had passed out the day before.  She also reported that she was a Type 1 diabetic, that she used an insulin pump, and that her blood sugars were normal.  (Doc. 9-10, pp. 73, 75).  She stated that she was having headaches and swelling in her hands and feet.  (Doc. 9-10, p. 73).  Ms. Black's neurologic, abdomen, cardiovascular, chest, neck, ENT, and eye exams were normal.  (Doc. 9-10, p. 75).

Ms. Black sought treatment again on June 27, 2019.  (Doc. 9-10, p. 77).  She had food poisoning, a left hip injury, an earache in her right ear, and a cyst on her right upper eyelid.  (Doc. 9-10, pp. 79-80).  The cyst caused pain and swelling and visual distortion.  (Doc. 9-10, p. 82).  The treating physician did not prescribe medication to treat the cyst.

On June 28, 2019, Ms. Black visited Cherokee Eye Center.  Ms. Black stated that she "woke up 4 days ago and couldn't see out of her right eye."  She reported

that her eye was swollen, and her vision was blurry.  Warm compresses eased her discomfort.  (Doc. 9-10, pp. 104-107).

On July 29, 2019, Ms. Black sought medical treatment again.  She was vomiting because of food poisoning.  Ms. Black was grimacing and reported aching pain.  (Doc. 9-10, pp. 88, 94-96).  She reported that she removed her insulin pump because she could not eat.  (Doc. 9-10, p. 96).  Ms. Black received a prescription for magnesium oxide and was sent home to rest.  (Doc. 9-10, pp. 100-01).

Ms. Black visited Harbin Clinic for a follow-up appointment on September 24, 2019.  (Doc. 9-11, p. 7).  The physician noted that Ms. Black had not been in for visit since April 2019.  (Doc. 9-11, p. 9).  Ms. Black reported that she was checking her blood sugar four times a day.  Ms. Black indicated that she was 24 weeks pregnant, and she had run out of insulin pump supplies a week earlier.  (Doc. 9-10, p. 9).  She was taking 30 units of Levemir every morning.  Ms. Black weighed 165 pounds and had a BMI of 28.3.  (Doc. 9-11, p. 9).  The physician instructed Ms. Black to check her blood sugar while fasting and two hours after each meal and to fax copies of her blood sugars every week.  (Doc. 9-11, p. 10).

On December 3, 2019, Ms. Black visited the Nephrology department at Harbin Clinic.  (Doc. 9-12, p. 11).  Her blood pressure was higher than normal.  (Doc. 9-12, p. 13).  Ms. Black's urinalysis results "showed 2+ blood dipstick, pH was 7.0 and protein was 3+, microscopic exam was unremarkable."  (Doc. 9-12, p. 13).  The

physician noted that Ms. Black had proteinuria during one of her previous pregnancies, and he expected the proteinuria would improve after Ms. Black delivered her baby.  (Doc. 9-12, p. 13).  The physician pointed out that Ms. Black would need to be rechecked in a couple months to be sure that she did not have chronic proteinuria.  The physician noted that Ms. Black had "excellent diabetes control" at that point.  (Doc. 9-12, p. 13).

*Ms. Black's Administrative Hearing*

Ms. Black's administrative hearing took place on December 19, 2019.  (Doc. 9-3, p. 46).  Ms. Black testified that she was a mother of two children, ages five and three, and pregnant at the time of the hearing.  (Doc. 9-3, pp. 55-56).  She testified that when her husband was not working, he took care of their children, but when he worked, she cared for them.  (Doc. 9-3, p. 56).  On a typical day, Ms. Black said she usually watched television or YouTube on the couch while her children played.  (Doc. 9-3, p. 56).  She testified that she did some of the housework, but her grandmother came once a week to clean the house.  (Doc. 9-3, p. 57).  Ms. Black stated that she did the laundry, washed the dishes, and cooked sometimes on her own.  (Doc. 9-3, p. 57).  She testified that she drove her son to and from school Monday through Friday.  (Doc. 9-3, pp. 56, 58).  Ms. Black testified that symptoms of her diabetes have caused her to be disabled since March 13, 2018.  (Doc. 9-3, p.

57).  She explained that she was passing out too much at work and that she had problems with her right hand.  (Doc. 9-3, pp. 57-58).

Ms. Black testified that she was using an insulin pump to treat her diabetes. (Doc. 9-3, p. 49).  She stated that with the insulin pump, her blood sugar levels still were abnormal.  (Doc. 9-3, p. 49).  She explained that if her blood sugar level was below 100, she would pass out or throw up or experience headaches and dizziness. If her blood sugar level was above 200, she would not pass out, but she would have headaches and dizziness, and she might throw up.  She testified that she struggled with these symptoms two or three times a week.  (Doc. 9-3, p. 50).  Ms. Black testified that when her blood sugar levels were abnormal, she had to take measures to correct her blood sugar and lie down for a couple of hours.  (Doc. 9-3, p. 50).  Ms. Black testified that her diabetes caused her to urinate frequently, so she had to visit the bathroom every 30 minutes.  (Doc. 9-3, p. 51).

When asked about problems with her eyes, Ms. Black testified that diabetes had caused retinopathy.  (Doc. 9-3, p. 54).  She stated that she saw "little red spots" called floaters from damage to her eyes.  (Doc. 9-3, p. 54).  She believed that her eyes were getting worse.  (Doc. 9-3, p. 54).  She explained that her prescription to correct her vision had increased a lot over the past couple of years.  (Doc. 9-3, p. 54).

Regarding her right hand, Ms. Black explained that she has tenosynovitis, meaning trigger finger, and she is right-handed. (Doc. 9-3, pp. 52-53). Ms. Black testified that she could not make a fist because her finger always was locked in an extended position. (Doc. 9-3, p. 52). She confirmed that her trigger finger caused her to drop things, have problems writing, and have problems using scissors. (Doc. 9-3, pp. 53-54). Ms. Black explained that her finger could be corrected with surgery, but because she was pregnant, she could not have the surgery. (Doc. 9-3, p. 53).

Ms. Black testified that she visited a kidney doctor shortly before the administrative hearing. (Doc. 9-3, p. 55). She stated that she had about 9,000 grams of protein in her urine, indicating that her kidneys might be damaged. (Doc. 9-3, p. 55). She stated that she would have her kidneys reevaluated in April 2019. (Doc. 9-3, p. 55).

Dr. Kessler, a vocational expert, testified that Ms. Black had work experience as a sewing machine operator, a fast-food manager, and a dietary aide. (Doc. 9-3, p. 60). Dr. Kessler stated that Ms. Black's past position as a dietary aide was medium, unskilled work, and her work as a sewing machine operator and fast-food manager were classified as light jobs but explained that Ms. Black performed her work as a fast-food manager at the medium level, skilled. (Doc. 9-3, p. 60). The ALJ asked Dr. Kessler:

> if you assume a person who is a younger individual with a high school equivalent education and the work experience of Ms. Black and she can

perform work at a light level of exertion as that term is defined in the regulations except she could frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes, or scaffolds; she should avoid concentrated exposure to extreme cold, heat, and any exposure to hazards.  Could she return to any of Ms. Black's past work?

(Doc. 9-3, pp. 60-61).  Dr. Kessler testified that the person could return to the sewing machine operator and the fast-food management position as the jobs are usually performed but not as Ms. Black had performed them.  (Doc. 9-3, p. 61).  The ALJ asked whether there were other jobs in the economy the individual could perform. Dr. Kessler stated there were general office clerk, receptionist, and information clerk jobs that could be performed by the individual.  (Doc. 9-3, p. 61).

Ms. Black's attorney asked Dr. Kessler what level of absenteeism was generally tolerated in the jobs that she (Dr. Kessler) identified for the ALJ.  (Doc. 9-3, p. 62).  Dr. Kessler testified that "[m]ost employers won't tolerate more than one to one and a half days per month of absenteeism."  (Doc. 9-3, p. 62).  When asked what level of off-task behavior generally is tolerated in the jobs identified for the ALJ, Dr. Kessler indicated that generally, no more than 5% in addition to three regular breaks would be tolerated.  (Doc. 9-3, p. 62).  Dr. Kessler testified that if a person had to use the bathroom every 30 minutes, the person in the ALJ's first hypothetical would not have the same jobs available to them.  (Doc. 9-3, p. 62).

## THE ALJ'S DECISION

The ALJ issued an unfavorable decision.  (Doc. 9-3, p. 28).  The ALJ found that Ms. Black had not engaged in substantial gainful activity since March 13, 2018, the alleged onset date.  (Doc. 9-3, p. 33).  The ALJ determined that Ms. Black was suffering from the severe impairment of diabetes mellitus.  (Doc. 9-3, p. 33 (citing 20 CFR 404.1520(c))).  The ALJ also determined that Ms. Black was suffering from the non-severe impairments of trigger finger and non-proliferative diabetic retinopathy.  (Doc 9-3, p. 34).  Based on a review of the medical evidence, the ALJ concluded that Ms. Black did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 9-3, p. 34).

In light of Ms. Black's impairments, the ALJ evaluated Ms. Black's residual functional capacity.  The ALJ determined that Ms. Black had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except she [could] frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes or scaffolds.  She should avoid concentrated exposure to extreme cold, heat, and any exposure to hazards.

(Doc. 9-3, p. 35).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some

pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone can do light work, . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria is met."  20 C.F.R. § 404.1567(a).

Based on this RFC and the VE's testimony, the ALJ concluded that Ms. Black could perform her past relevant work as a sewing machine operator and a fast-food manager as generally performed.  (Doc. 9-3, p. 38).  Alternatively, the ALJ found that jobs existed in the national economy that Ms. Black could perform, including an office clerk, a receptionist, and a clerk. (Doc. 9-3, p. 37).  Accordingly, the ALJ determined that Ms. Black was not under a disability, as defined by the Social Security Act, at any time after March 13, 2018, the alleged onset date. (Doc. 9-3, p. 39).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s]

the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Black contends that the ALJ improperly credited Dr. Kessler's expert testimony about her (Ms. Black's) ability to work because the hypothetical question the ALJ posed to Dr. Kessler was not based on a "correct or full statement of [Ms. Black's] limitations and impairments." (Doc. 11, p. 19). Ms. Black argues that the ALJ improperly omitted from the hypothetical Ms. Black's pain level and her limitations due to diabetes. Ms. Black posits that her "diabetes is uncontrolled at times," and she suffers from fatigue, headaches, tingling, numbness, vision change, paresthesia, and extremity pain. (Doc. 14, p. 1) (emphasis omitted). She contends that she "will miss a significant number of days of work." (Doc. 14, p. 5). Relatedly, Ms. Black challenges the ALJ's finding that she can perform past relevant work. Ms. Black contends that the ALJ failed to make specific findings regarding the physical and mental demands of her past relevant work. (Doc. 11, p. 13; Doc. 14). We examine the ALJ's hypothetical question first and then turn to the ALJ's analysis of Ms. Black's past relevant work.

As noted, the ALJ posed the following hypothetical to Dr. Kessler, the VE:

if you assume a person who is a younger individual with a high school equivalent education and the work experience of Ms. Black and she can perform work at a light level of exertion as that term is defined in the regulations except she could frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes, or scaffolds; she should avoid concentrated exposure to extreme cold, heat, and any exposure to hazards. Could she return to any of Ms. Black's past work?

(Doc. 9-3, pp. 60-61). The ALJ accurately captured the RFC that the ALJ determined for Ms. Black in the hypothetical question. (Doc. 9-3, p. 35). Substantial evidence supports that RFC.

An RFC must reflect the claimant's ability to do physical and mental work on a sustained basis despite limitations caused by her impairments. When determining a claimant's RFC, an ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(e) and 404.1545. The ALJ considered the limitations caused by Ms. Black's Type 1 diabetes. The ALJ acknowledged the symptoms which Ms. Black contends the ALJ overlooked, and the ALJ concluded that the evidence does not support the limitations that Ms. Black attributes to those symptoms. (Doc. 9-3, p. 36). The ALJ did not find evidence in Ms. Black's medical records to support her testimony that she passed out frequently or that she had to use the bathroom frequently. (Doc. 9-3, p. 36). The Court has found only one record in which Ms. Black reported that she passed out. At the time, she was 11 weeks pregnant, and she stated that her blood sugars were normal. (Doc. 9-10, pp. 73, 75). The Court has not found a medical record in which Ms. Black complained of frequent urination. Similarly, the Court has not found medical records in which Ms. Black complained of headaches. The ALJ listed several records in which Ms. Black did not complain of fatigue. (Doc. 9-3, p. 36). The Court has found two records in which Ms. Black complained of fatigue, (Doc. 9-8,

pp. 19-20, 138), but the ALJ's conclusion that Ms. Black's report of fatigue is not as limiting as she contends finds substantial support in the record.  The ALJ also accurately noted that Ms. Black's ability to control her diabetes improved when she received an insulin pump.  (Doc. 9-3, p. 36).  Ms. Black's medical records show that vision changes related to her diabetes were corrected with contact lenses, (Doc. 9-8, p. 4), and surgery to correct her trigger finger was available to Ms. Black after she recovered from the delivery of her third child, (Doc. 9-8, pp. 83-84).

In determining Ms. Black's RFC for light work, the ALJ properly relied on the opinions of state agency physicians.  (Doc. 9-3, p. 37).  The ALJ did not pull the RFC for light work from thin air.

Because the ALJ properly discounted Ms. Black's testimony about her limitations, the limitations that the ALJ included in Ms. Black's RFC were proper for the VE to consider. *See McSwain v. Bowen*, 814 F.2d 617, 619-20 (11th Cir. 1987) (finding that a hypothetical question is proper when it contains only those functional limitations the ALJ found supported by evidence in the record); *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986).

Similarly, the ALJ properly evaluated Ms. Black's ability to perform her past relevant work.  An ALJ must make a finding of the physical requirements and demands of the claimant's past work to properly determine whether a claimant "retain[s] the physical capacity to perform it."  *Nelms v. Bowen*, 803 F.2d 1164, 1165

(11th Cir. 1986) (finding that general description of custodial work as cleaning without information regarding, for example, "the size and weight of the items [the claimant] was required to use" for her custodial work warranted "a further hearing with regard to the physical demands of [the claimant's] past work and her ability to perform the same in light of her impairments"). An ALJ "may rely on a VE's testimony regarding the physical and mental demands of the claimant's past work. The ALJ may also consider the job descriptions set forth in the DOT." *Simpson v. Comm'r of Soc. Sec.*, 423 Fed. Appx. 882, 884 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1560(b)(2) and 416.960(b)(2)).

The ALJ made a proper finding that Ms. Black could perform her past relevant work. At step four, the ALJ determined that Ms. Black "is capable of performing past relevant work as a sewing machine operator and fast food manager," finding that the work was not precluded by her RFC to perform light work. (Doc. 9-3, p. 37). The ALJ relied on testimony from a vocational expert. (Doc. 9-3, pp. 37, 59). Before asking the VE to testify, the ALJ asked the VE "[h]ave you reviewed the exhibits that pertain to Ms. Black's work history?" (Doc. 9-3, p. 59). The VE testified that she had, and she testified that Ms. Black's past work as a sewing machine operator and a fast-food manager were classified at the light level of physical exertion. (Doc. 9-3, p. 60). The ALJ asked the VE whether an individual with Ms. Black's RFC and limitations could perform Ms. Black's past work. (Doc.

9-3, pp. 60-61).  The VE testified that such an individual could perform Ms. Black's past work as it is usually performed—pointing out that Ms. Black had performed her fast-food manager work at the medium level "based on the record[]."  (Doc. 9-3, pp. 60-61).  The ALJ stated that her testimony regarding job descriptions was consistent with the DOT.  (Doc. 9-3, p. 61).

Moreover, based on the VE's testimony, the ALJ made an alternate finding that demonstrated that Ms. Black was not disabled.  (Doc. 9-3, p. 38, 61).  The ALJ proceeded to step five and determined there were other jobs in the economy that Ms. Black could perform.  (Doc. 9-3, p. 38, 61).  Consequently, substantial evidence supports the ALJ's conclusion that Ms. Black was not disabled.

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. Accordingly, the Court affirms the Commissioner.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 23, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE